7-2-2-1-0 Dana Ray, El Conlogue v. Scott Hamilton Good morning, Counsel. Good morning, Your Honors. May I reserve two minutes for rebuttal, please? Yes. Your Honors, my name is Hunter Tavares. I came down from Bangor, Maine, and I represent the appellate Dana Ray Conlogue in this case. And we're asking that you reverse the district court's decision granting Sergeant Hamilton qualified immunity because the law was clearly established at the time that a police officer cannot shoot and kill a suicidal person who is not an imminent threat to the police officers or anyone else. Particularly in a situation where the person is holding the firearm up in the air at at least a 45 degree angle, is 150 feet or more away from the police officers who are at least under partial cover, when this is a three plus hour standoff where the person has never threatened the officers, never fired the gun. Well, you know, you're giving us a lot of facts, you know, and I'm not sure that they're an accurate representation. You say, for example, he never threatened the officers. I thought there was uncontested evidence in the record that he pointed at the officers with his hand in the shape of a gun. There is, Your Honor. Isn't that a threatening gesture? Perhaps the officers could have taken that as a threatening gesture. How else could you take it? Also that he was identifying their location, Your Honor. That's part of the officer who was given kind of a play-by-play. But he wasn't pointing. There's a difference between shaping your hand like a gun and pointing at someone. I agree, Your Honor. And that occurred, though, hours, I believe, before the officer chose to shoot and kill Mr. Conlogue as well. So this wasn't something that was an immediate threat, even if it's considered a threat. No, wait a minute. It is true that the standoff lasted for over three hours, all right? But it was not three hours of constant repetition of the same activity or inactivity. And the critical fact, it seems to me here, is what the effect is of the decedent pointing his loaded firearm from 150 feet away, easy firing range, in the direction of the officers, albeit at a 45 degree angle, but in their direction, aimed slightly over their heads. That was something that had not happened before. And the question is whether or not an objectively reasonable police officer would deem conduct like that to be an imminent threat. And why isn't it an imminent threat? Here's a man, admittedly a disturbed man, all right, who suddenly escalates his conduct, engages in behavior he hasn't engaged in during the prior three hours, and is no longer pointing the gun at himself, but is pointing it in the direction of the officers after making a threatening gesture. Within easy firing range, and one of the officers toward whom the gun is aimed, all right, declares over the radio words and in a tone from which a listener such as Sergeant Hamilton could deduce that the officer himself felt in fear. Let me address that, Your Honor. First, the gesture that the court's characterizing as threatening about him pointing his finger, that occurred long before the shot was fired. At the time the shot was fired, the situation really hadn't changed much. Mr. Convall, Lewis had been at the car for minutes at that point. Well, it had changed a lot from the beginning, because for the first part of the standoff, an hour and 15 minutes, Convall was sitting on a rock, and from time to time pointing the gun at his own head, all right? He wasn't moving in the direction of the officers, let alone pointing his gun in the direction. So the situation was certainly evolving. Plus the officers perceived that the medication that had him in a state was wearing off. And that's all correct, but I think the salient point here is that at no time did he point the gun at the officers. Well, counsel, can I just read something to you? This is what the district court, these are the words of the district court in its opinion. This is just before the fatal shot. And he says, Conlow then began flexing his wrist, moving the barrel of the gun closer to Fisk's head, one of the officers on the other side of the road, so that Fisk could see down the barrel of the gun and then back up. I mean, that suggests proximity between the deceased and one of the officers, suggests that that proximity was such that the officer could see down the barrel of the gun. And the court goes on to say that Fisk, he's quoting Fisk here, this is the officer who was able to see down the barrel of the gun, Fisk then responded, describing what Fisk has seen, about 45 degrees still over our heads, but I'm not comfortable. This is what Hamilton is seeing and hearing, just before he fires the fatal shot. I think you said something important there, your honor, that I want to make clear. Two for Fisk's claim that he saw the gun being lowered down to where he could see down the barrel of the gun, that should have no bearing whatsoever in the court's determination about whether Sergeant Hamilton thought that deadly force was necessary at that time. Because that information, if it occurred, was never relayed to Officer Hamilton. Officer Hamilton did not see that and whether this happened or not wasn't relayed over the radio. Isn't it an indication that Sergeant Hamilton's perception of the situation was shared by Fisk, who was the target? Aren't the perceptions, the contemporaneous perceptions of others involved in the incident or present at the scene, aren't those relevant to the question of objective reasonableness? Their perceptions, as it is known to Sergeant Hamilton, would certainly be relevant. I'm not talking about known to Sergeant Hamilton. We're not talking about subjective reasonableness, which would depend on what Sergeant Hamilton alone knew. We're talking about what a hypothetical, objectively reasonable police officer standing in Sergeant Hamilton's shoes would have done. And in answering that question, aren't the perceptions of other experienced police officers who are at the scene observing and experiencing the same events as Sergeant Hamilton, aren't those relevant in answering the question of what an objectively reasonable police officer would or would not have done? What's important, Your Honor, is what Sergeant Hamilton knew. It seems to me that what's important to me is that I've asked the same question three times and haven't gotten an answer yet. Well, the answer, Your Honor, then respectfully would be no. It's not important to what Sergeant Hamilton saw. So it's not important. It's strictly a question of what Sergeant Hamilton knew and it doesn't matter what the other officers perceived or thought. And why does it not make the test one of subjective reasonableness if it's depending just on what Sergeant Hamilton knew? It's objective. It's based on what information he knew and how an objective police officer would have acted under that situation. Well, is it a tell how an objective police officer would have reacted than by asking other police officers who saw and heard the same things, the same events, how they reacted? Well, we know how they reacted, Your Honor. None of them used deadly force against Sergeant Hamilton. No, we know the two of them said they were in the process of getting ready to fire when Sergeant Hamilton fired. I know that was said, Your Honor, but there was no action to support that. And actually at the time that the shot was fired, it was reported that it was self-inflicted, which I think is interesting. This case is really not different from McKinney that the court decided not too long ago, Your Honor. Would you concede that I might know a little bit about McKinney? I understand you're one of the judges on the case, Your Honor. No, I was the author of the opinion. And I understand. And this case has about the same similarity to McKinney as the current president has to the immediate past president. I don't know if I would agree with that, Your Honor. That may be an overstatement. And I would agree with that. But in McKinney, we have someone who is 69 feet away from the officer, mentally disturbed, the gun down. Here we have someone three times as far away from the officer with the gun up rather than down. And no warning that deadly force would be used. More ample opportunity in three-plus hours that deadly force could be used. But, Counsel, there were, over this three-plus hour, there were constant warnings to him to not go beyond, to not come closer, to put the gun down. I mean, to suggest that there weren't warnings in this situation strikes me as completely contrary to the facts as found by the district court. So I don't, are you saying because there wasn't, in the seconds before the fatal shot, there were not a reassertion of the warning? Is that the point that you're making? I think the record is undisputed, Your Honor, that at no point was there ever a warning that if you do not put the gun down, that we will shoot at you or that deadly force will be used. Is there any case in this circuit or any other circuit requiring that specific form of warning? The McKinney case talks about it. The McKinney case talks about the fact that some warning must be given. It doesn't talk about any magic words, doesn't say what the warning has to say, and if you don't obey the warning, deadly force will be used. That's never been a requirement of our cases, and I at least have been unable to find any case anywhere that requires that precise form of warning. The Tennessee First Gardner case by the Supreme Court suggested that if feasible, a warning should be given before deadly force is used. But it doesn't specify, you don't want a warning, because there were serial warnings in this case, including one immediately before the tragic event, which is another of the many distinctions between this case and McKinney. But you don't want just some warning, you want a particular precise form of warning, not one that the Supreme Court announced in Tennessee against Gardner or any other court has endorsed as the required or even preferred form of warning. Well, when the court in Gardner is talking about a warning, I would think it only could be talking about a warning to use deadly force. Here we have no warning that anything is going to happen, only that he needs to put the firearm down. And we don't know if the warning was given, if he would have complied, because he did comply with other commands that were given. But we know he was told 5, 6, 7, 8 times to drop his weapon and that he did not heed any of those warnings, the last of which happened seconds before the fatal shot was fired. And we do know that he, moving towards the road, when told not to come any closer, that he did back up and not proceed towards the road. And I understand Your Honor may not agree with me, but I have a hard time seeing the distinctions between McKinney and the current situation. In McKinney, was there a warning given at any time within a minute, two minutes, three minutes before the final shot was fired? Any kind of warning? No. No, there wasn't. In McKinney, was the gun ever pointed at or near the time of the shooting at anybody? No. The gun was being held down. In McKinney, were there any threatening gestures? No. I mean, there is a whole series of distinctions. I understand your position, Your Honor. I can address more of that in rebuttal, if you'd like. Thank you. Good morning, Your Honors. I'm Jonathan Bolton. I'm an assistant attorney general, and I represent Sergeant Hamilton. The court should affirm the district court's thorough, well-reasoned decision granting summary judgment to Sergeant Hamilton. Mr. Bolton, I ask you a question that I tried without much success to get the answer from you. What should we do with evidence of the perceptions of other officers, such as Fisk's description of how he felt as though he was looking down the barrel of the gun, and such as the two other officers who said that they were in the process of readying themselves to fire when Hamilton fired the fatal shot? What significance, if any, does that evidence have? I think it certainly has relevance, Your Honor. And I think you can look at the court's decision in the Cialinus case, where the court did exactly that. They looked at the perceptions of Cialinus, is the name of the case, from a few years ago. And that was a case, actually, where summary judgment to the defendant officer was denied. But in denying summary judgment, the court looked at the perceptions of other officers that they did not see a threat posed by the suspect. And the district court cited Cialinus in its discussion of why this information is relevant. And it's relevant, Your Honor, because it confirms that Sergeant Hamilton was accurately perceiving the situation, that there was, in fact, the threat that he thought there was. It's further evidence that confirms that he was making a reasonable judgment. And that's why it's relevant, Your Honor. Well, just suggesting, counsel, we certainly have seen cases where the account of the shooter, of what he perceived at the moment that a shot was fired, those perceptions are belied by accounts of other officers involved in the episode, who will, in effect, say that they did not perceive any threat, that they did not feel threatened in the way that the shooter perceived. And those cases are used, those contrary accounts are used to undermine the objective reasonableness of the perception of the shooter. Here, as you're suggesting, the perceptions of the officers who were facing the gun tend to confirm the officer Hamilton's view of what was happening. The reasonableness of his view. So they can go either way. They can be supportive or they can undermine the perception of the shooter. Certainly, I think that's true. I think in this case, though, you have the evidence all points in one direction, which points towards the reasonableness of Sergeant Hamilton's actions. And I think it's one piece of evidence that goes to show that this was a reasonable action. It's certainly not the only thing that we're relying upon, but it's one piece. And the way I would put it is that it confirms that the perception that he had was a reasonable perception. Is there some line drawing that we need to think through? For instance, if the shooter is a greater distance away and has hardly any perception of what's going on at the actual scene, but fires a shot with a vaguer understanding. I'm sorry. You mean the shooter meaning the officer using force? Yes, the police officer. Could you repeat the question? If he's at a greater distance and we're saying that he may have a right to rely upon the perception of his fellow officers, is there some line drawing in the event, for instance, that he's at a greater distance away? Because right now he has a perception, but we're also saying that the other officer's perception supports his perception. Well, I think, Your Honor, if there's line drawing, I don't think there necessarily is in this case. I mean, I think the situation that comes to mind that you could see in a future case is if the officer is at some distance away, is relying upon something that he's hearing over the radio, and he has independent reason to believe that that information is not accurate for some reason. That might present a different case, but there's no suggestion of that in this case. Sergeant Hamilton, he could see the individual, Mr. Conlogue. He could see some of what he was doing. He could see that he had his arms extended across the windshield of the car, and then he gets confirmation over the radio that the gun is, in fact, being pointed towards the other two officers, and it is, in fact, at a 45-degree angle over his head. So I think in that case, you have, again, all the evidence sort of points in one direction. It all points towards a single accurate picture of what's going on, and there's really no reason for Sergeant Hamilton to question the information he was getting from Trooper Fiske. Counsel, there's reference to radio communications among the officers. Yes. In the district court's decision, again, there's this statement. Fiske is responding to Doobie, I believe, and Fiske is saying, again, this is just before the fatal shot, about 45 degrees, still over our heads, but I'm not comfortable. Would Hamilton be hearing that communication between Fiske and Doobie? Yes. The record, I think what the undisputed statement of facts shows is that Sergeant Hamilton did hear that. The shot was fired when Trooper Fiske was in the middle of saying, I'm not comfortable, and if you listen to the snow recording in particular, you can hear that very clearly. You can hear Trooper Fiske speaking and you can hear the gunshot occurring while he's finishing his sentence. That's sort of the timeline there. But obviously those conversations that were occurring in the last few minutes, I think, are really important. They show that the officers or Trooper Fiske is extremely concerned about what's going on. At one point, also near the end, he says it's getting dangerously close. He says it's at a 45-degree angle. Sergeant Hamilton is hearing all that. There's an undisputed statement that he's hearing all the radio traffic through either his own radio or Trooper Doobie's radio, who's positioned right next to him. And all of that radio traffic, we think, again, points in the direction of this was a situation. It started out perhaps more of a routine situation, and it gradually over the course of the three hours became more and more alarming. The actions escalated from shouting profanity, then he arms himself with a knife, then he does the gesture that Your Honor mentioned about pointing at the officers with his hand in the shape of a gun, which I agree can have no other purpose than to threaten. There's no other reason you would do that than to threaten somebody. He starts advancing towards the officers and then retreating, drawing lines in the sand. Then you have this situation where he pulls the magazine out of his gun, holds it up for the officers, and then loads a new fully loaded, which Trooper Fiske can see, it's a fully loaded magazine that he loads back into his gun. So he makes sort of a display of reloading his gun. That's 10 minutes before the fatal shot happens, maybe 12 minutes before the fatal shot happens. So all that happens, and then he points the gun over Trooper Fiske's head. Sergeant Hamilton is starting to think, boy, I might have to use deadly force here. Before he makes a decision, the gun goes back up in the air, and then just a few minutes later he does it a second time and Trooper Fiske says, I'm not comfortable. Sergeant Hamilton hears a warning being given by the officer of the PA system, which is you need to put the gun down right now. That is most certainly a warning, especially in the context that we're talking about, where you have somebody who can only be deliberately pointing a gun over the head of these troopers, which is a threatening act. He's doing it deliberately. He hears a warning like that over the PA. You have to put the gun down right now. There's no way he wasn't aware that he was taking his life into his hands by taking that action. It's inconceivable that he wasn't aware that the consequences of that could be life-threatening. So throughout this chain of events, you had a situation that really escalated to the point of being a very scary, very alarming situation in which it was reasonable for Trooper Fiske, I'm sorry, for Sergeant Hamilton to use deadly force in that situation. There's talk of this concept of action and reaction time. Yes. I guess officers are trained to, to some extent, I gather, sort of preempt what could be the shooting of, in this case, someone who's threatening suicide. I guess the notion is they know when they're going to shoot, you don't, and so you probably need to act before they act. It's a spun out, it's a somewhat troubling concept, though it seems to me that it could be used to justify these kind of preemptive shootings in circumstances where perhaps that preemptive shooting was not warranted. Is that a, that concept of action-reaction time, is that important to the analysis here? Well, your Honor, I think what makes it important, and I understand why you could have a different case where that could be, an argument like that could be more troubling. I don't think it should be troubling in this case, simply because of how close we were in this situation to shots being fired and how quickly that could have happened. I mean, this is not a situation, even like McKinney, where he's got the gun dangling by his side and maybe there's, you know, if he's got to bring the gun up from his side, there's a longer duration there and you could have a debate about action versus reaction. That's my concern, because it seems like that darkroom could have been used in that case. Yeah, I understand the concern. I think in this case where the gun is, and the district court, you know, I can't remember the exact turn of phrase, but, you know, just needs to lower his arm a little bit and fire. And I think if you look at Sgt. Hamilton's deposition, he says this too, you know, it's essentially indistinguishable to pointing, and he didn't use those exact words, but he didn't see any difference between pointing a gun right over somebody's head and pointing it right at them. It's essentially the same thing. So, you know, in that case, I think it's not even a question of police training. I think it's just sort of common sense. Well, you know, in that circumstance, you know, you're not going to be able to, if he decides to fire, there's nothing you can do. You can't dodge a bullet if the bullet is accurately fired. That really doesn't answer the question of what the aphorism, you know, action before reaction, what that adds to the mix here. Because if the action that the officer preemptively takes is not objectively reasonable, independent of the aphorism, then he ought to be held liable for it. If it is objectively reasonable, he ought to have the benefit of qualified immunity, regardless of whether he knows about the aphorism or is trained in it. So I'm struggling with the notion of why the aphorism has anything to do with it. And I see the potential that, in certain cases, it could be used as a justification for conduct that ought not to be justified. I take Your Honor's point. I don't think you need to rely on that aphorism in this particular case. This Court, in previous cases, has expressed an interest in police training, police protocol, and whether police were following their training and their protocol in dealing with these deadly force situations. I think that information is in the record because it shows that the officers were responding in accordance with their training and in accordance with how they're taught to perceive things. But I agree with you in this case. I mean, I think you don't have to get to the point of applying that as some sort of aphorism. I think if you have a situation where you have a gunman, he's pointing his gun over the heads of fellow officers, and you're in a position where essentially the only action you can take is to shoot or not shoot, that's a reasonable action to take that step to protect your fellow officers. The only other point I just wanted to make, if I have time here, is that on this issue of warning that was raised before, what Tennessee v. Garner says is that there has to be, quote, some warning. It doesn't say, as I think was pointed out, it doesn't say what the warning has to be, and the way it's phrased is some warning suggests that this is a very flexible concept. And again, I guess I already made this point earlier, but in the context of what was happening here and what Mr. Conlogue was intentionally doing, he had to have known that his life was in jeopardy based on the actions he was taking. If there's nothing further, the rest of my brief. Your Honors, if you look at the recording and the video in the last five minutes before Mr. Conlogue is shot, and you listen to it, I would suggest that there's not the urgency that the State or the defense wants you to find that there is. And there's no reason to think that this man, who has been in the parking lot for 3 hours and 20 minutes, is going to shoot any of the officers, because he hadn't done that for 3 hours and 20 minutes. He had the gun in the air, and he never discharged it. And Sergeant Hamilton, he was not in the best position to even see if there was a threat. He was 400 feet away, couldn't even see the gun in his hand. He's relying on Trooper Fisk, who has the better position, still 150 feet away, which is probably longer than this courtroom, behind the tractor. And he tells him that, he asks where the gun is. He tells him at one point the gun's 45 degrees in the air, asks him where the gun is again. He says, now the gun's up in the air. And then the gun's back at 45 degrees in the air. And then he just shoots him. And I would suggest, Your Honors, that that shouldn't be protected by qualified immunity. Whether it's unreasonable under the Fourth Amendment, perhaps a jury should decide that. But to just shield the officer from any liability under qualified immunity, I would suggest, especially in light of McKinney, in other cases, the court should decline to do that. And McKinney, the suspect is walking towards the police officer. He's moving towards the police officer, getting closer. With the gun down, could easily have moved the gun up. And the court found that wasn't acceptable, or at least protected by qualified immunity. Wasn't it Hamilton's judgment, given what Fisk was able to describe, that Fisk was exposed in some way? In other words, he was not fully behind cover. If he had been, he could not have described what he was perceiving. Wasn't that another important consideration, that judgment, that Fisk was, in fact, exposed if a shot was fired? Sergeant Hamilton understood that Trooper Fisk was about 150 feet away, and at least partially exposed. Yes, Your Honor. Thank you.